## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

**TENA MARIE DAMRON,** )
    Plaintiff )
     )     Civil Action No. 1:22cv00025
v. )
     )     **REPORT AND**
     )     **RECOMMENDATION**
**KILOLO KIJAKAZI, Acting** )
**Commissioner of Social Security,** )
    Defendant )     By: Pamela Meade Sargent
     )     United States Magistrate Judge

### *I. Background and Standard of Review*

Plaintiff, Tena Marie Damron, ("Damron"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Damron protectively filed her application for DIB on January 28, 2015, alleging disability as of March 3, 2008,[1] based on hydronephrosis;[2] back problems; depression; left-sided numbness; migraine headaches; irritable bowel syndrome; and vision problems due to bladder medication. (Record, ("R."), at 12, 72, 182-83, 196.) The claim was denied initially and upon reconsideration. (R. at 145-47, 152-57.) Damron then requested a hearing before an administrative law judge, ("ALJ"). (R. at 159-60.) The ALJ held a hearing on February 6, 2018, at which Damron was represented by counsel. (R. at 63-103.)

By decision dated June 11, 2018, the ALJ denied Damron's claim. (R. at 12-28.) After the ALJ issued his decision, Damron pursued her administrative appeals. (R. at 176, 253-60), but the Appeals Council denied her request for review. (R. at 1-5.) Damron then filed an action in this court seeking review of the ALJ's unfavorable decision. *See Tena Maria Damron v. Andrew Saul,* Civil Action No. 1:19cv00020. By Order dated July 27, 2020, this court vacated the Commissioner's decision and remanded Damron's case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with the Report and

---

[1] Damron initially alleged an onset date of March 3, 2007; however, at her hearing, she amended her alleged onset date to March 3, 2008. (R. at 72-73, 182.)

[2] Hydronephrosis is the swelling of one or both kidneys. This occurs when urine cannot drain from a kidney and builds up in the kidney as a result. *See* https://www.mayoclinic.org/diseasesconditions/hydronephrosis/cdc-20397563 (last visited Nov. 8, 2023).

Recommendation issued on June 26, 2020. (R. at 1260-78.) By order dated September 2, 2020, the Appeals Council vacated the final decision of the Commissioner and remanded Damron's claim to the ALJ for further proceedings. (R. at 1281.) Upon remand, the ALJ held a supplemental hearing on February 3, 2021, at which Damron was again represented by counsel. (R. at 1198-1228.)

By decision dated February 18, 2021, the ALJ denied Damron's claim. (R. at 1138-53.) The ALJ found that Damron met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013. (R. at 1140.) The ALJ found that Damron had not engaged in substantial gainful activity during the period from her alleged onset date of March 3, 2008, through her date last insured of December 31, 2013.[3] (R. at 1140.) The ALJ determined that, through the date last insured, Damron had severe impairments, namely chronic kidney disease, radiation cystitis; hydronephrosis; and degenerative disc disease, but he found that Damron did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1140, 1143.) The ALJ found that, through the date last insured, Damron had the residual functional capacity to perform light[4] work that required no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling or exposure to vibration and work at unprotected heights. (R. at 1144.) The ALJ found that, through the date last insured, Damron was able to perform her past relevant work as a courier. (R. at 1152, 1223.) In addition, based on Damron's age, education,

---

[3] Therefore, Damron must show that she was disabled between March 3, 2008, the alleged onset date, and December 31, 2013, the date last insured, to be eligible for benefits.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2022).

work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Damron could perform, including the jobs of a laundry folder, a cashier and a non-postal mail clerk. (R. at 1152-53, 1223.) Thus, the ALJ concluded that, through the date last insured, Damron was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 1153.) *See* 20 C.F.R. § 404.1520(f), (g) (2022).

After the ALJ issued his decision, Damron pursued her administrative appeals, (R. at 1385-86, 1423, 1430-41), but the Appeals Council denied her request for review. (R. at 1254-58.) Damron then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Damron's motion for summary judgment filed February 1, 2023, and the Commissioner's motion for summary judgment filed March 2, 2023.

## *II. Facts*[5]

Damron was born in 1962, (R. at 182), which, at the time of her alleged onset date, classified her as a "younger person" and, at the time of her date last insured, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(c), (d). Damron obtained her general educational development, ("GED"), diploma and she has specialized training as a medical assistant. (R. at 71, 197.) She

---

[5] Damron's only dispute is with respect to the ALJ's assessment of her physical limitations. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-13.) Therefore, the court will address the facts relevant to Damron's physical residual functional capacity.

has past work experience as a courier, a store laborer, a furniture salesperson and a stock clerk. (R. at 1222-23.) At her hearing, Damron testified that she was in a motor vehicle accident while working home health on March 3, 2008. (R. at 1211-12.) She testified that, during the time at issue, she had experienced severe back and neck pain and muscle spasms. (R. at 1215-16.) Damron stated she received injections in her neck and back, which "helped a little bit," but she could no longer receive these injections because of her kidney problems. (R.  at 1212-13.) She stated she took Tylenol four times a day, which provided some pain relief. (R. at 1302.) Damron testified that she spent three to four hours in the bathroom each morning due to stomach issues, including vomiting and diarrhea. (R. at 85, 1219.) She stated her kidneys and bowels were damaged due to undergoing radiation for cancer.[6] (R. at 1216.) Damron stated that she experienced these problems during the time at issue. (R. at 85.) Damron stated that she had surgery, which helped her stomach issues "a little bit." (R. at 85.)

In rendering his decision, the ALJ reviewed medical records from Dr. Richard Surrusco, M.D, a state agency physician; Dr. Henry Scovern, M.D., a state agency physician; Dr. Jim C. Brasfield, M.D.; Johnston Memorial Hospital; Dr. William E. Kennedy, M.D.; Dr. John C. Fraser, M.D.; Abingdon Physician Partners; Mountain Gastroenterology, P.C., ("Mountain Gastroenterology"); Urology Center of Southwest Virginia, ("Urology Center"); East Tennessee Brain and Spine Center, P.C.; Dr. Gopal H. Badlani, M.D., a urologist; Wellmont Medical Associates; Urology Associates of Kingsport; and University Surgeons Associates.

---

[6] In 2002, Damron had cervical cancer, which was treated with a hysterectomy and radiation. (R. at 314.) She continued regular follow up, and there have been no signs of recurrence of the cancer. (R. at 314.) In 2014, it was noted that Damron had developed radiation cystitis because of her radiation treatment. (R. at 419.)

As previously noted, Damron must show that she was disabled between March 3, 2008, the alleged onset date, and December 31, 2013, the date last insured, to be eligible for benefits. Therefore, the court will focus on the evidence pertaining to this time period.

By way of background, in April 2007, a CT scan of Damron's abdomen and pelvis showed multiple stones in both kidneys without evidence of hydronephrosis or ureteral dilatation and nonspecific bowel gas pattern without evidence of obstruction. (R. at 456-59.) In May 2007, Damron saw Dr. James A. Mann, M.D., a gastroenterologist at Mountain Gastroenterology, who diagnosed nausea and vomiting of questionable etiology, noting that Damron had significant gastritis in the past; abdominal cramping and diarrhea, possibly due to a partial small bowel obstruction; post carcinoma of the cervix; and heme positive stool. (R. at 366-67.) On May 23, 2007, a gastric emptying study showed normal gastric emptying fraction of 77 percent. (R. at 370.) In June 2007, Damron was treated for urinary tract infections, urine incontinence and kidney stones, and it was noted her hydronephrosis was resolved. (R. at 392-93.)

On March 3, 2008, her alleged onset date, Damron was involved in a work-related motor vehicle accident. (R. at 77.) Damron was not treated immediately after the accident and returned to work that day. (R. at 77-78, 274.) On March 4, 2008, she worked a full day doing her normal work duties. (R. at 274.) On March 5, 2008, Damron did not work because she felt lightheaded. (R. at 274.) On March 6, 2008, Damron returned to work but, later that day, she did not feel well and was treated at an urgent care facility for complaints of right lower abdominal pain and swelling and neck and low back pain. (R. at 274, 296.) Damron exhibited tenderness in her left lower quadrant; her motor and sensory examinations were normal; her deep tendon

reflexes were symmetric; she had a normal gait; her neck had full range of motion with no tenderness to palpation; she had tenderness on palpation of the lower back, but she had full range of motion; and she had normal reflexes. (R. at 297.) X-rays of Damron's abdomen showed bilateral nephrolithiasis; prior pelvis surgery; and no signs of bowel obstruction. (R. at 261.) X-rays of Damron's cervical spine showed degenerative disc disease at the C5-C6 disc space. (R. at 262-63.) Damron was diagnosed with neck pain, abdominal pain and chest pain. (R. at 297.)

On April 14, 2008, Damron's primary care physician referred her to Dr. Jim C. Brasfield, M.D., a neurosurgeon, for her continued complaints. (R. at 274.) Damron had excellent range of motion of her neck; she could touch her chin to her chest; she had present and symmetric reflexes of the upper extremities; her knee reflexes were increased, which was concerning; she had normal strength in her upper extremities; she had normal range of motion of her shoulders; her cervical lordosis appeared normal; and her cervical range of motion was intact. (R. at 275.) Although Damron reported a headache, Dr. Brasfield stated that her demeanor was "out of place and inappropriate" for someone with a headache. (R. at 275.) Dr. Brasfield diagnosed cervical strain and noted that "[t]here is no question in my mind that . . . some supratentorial overlay exists in this patient's presentation. The fact that the patient has made application for disability only a month after the accident and in the phase of what appears to be reasonably normal exam certainly makes me concern[ed] about any supratentorial factors." (R. at 275.) Dr. Brasfield told Damron that he thought she would be able to return to her regular work activity without restrictions, noting that Damron's diagnostic studies were normal.[7] (R. at 275-76.)

---

[7] On April 10, 2008, a CT scan of Damron's head was normal. (R. at 451-52.) That same day, a fluoroscopy of Damron's cervical spine showed a stable appearance with disc disease at the C5-C6 disc space. (R. at 453.) An MRI showed no evidence of disc extrusion, and although there

On April 21, 2008, a nuclear bone scan showed an area of increased bone activity in the lateral/anterolateral aspect of the right fifth rib; bilateral renal activity, as well as activity in the urinary bladder; and marked increased activity in what appeared to be dilated upper and lower lobe caliceal system on the right. (R. at 442-43.) That same day, a cervical myelogram showed spondylosis and disc protrusion changes at multiple levels, being most marked at the C4-C5 and C5-C6 disc spaces and some foraminal narrowing on the right at the C5-C6 disc space. (R. at 445-46.) A CT scan of Damron's cervical spine showed spondylosis and disc protrusion changes as identified in the cervical myelogram and "lytic"[8] defect in the upper aspect of the C6 vertebral body adjacent to the pedicle. (R. at 447-49.)

On May 6, 2008, Damron returned to Dr. Brasfield, at which time he noted that

> "patient had made application for disability quite soon after the motor vehicle accident. The patient has had full diagnostic studies. These fail to demonstrate any trauma related abnormality. The patient's physical examination has been normal. I have detected some overlay in her physical presentation . . . Utmost, the patient has some cervical and lumbar strain." (R. at 271.)

On June 9, 2008, Damron's primary care physician referred her to Dr. John C. Fraser, M.D., a neurosurgeon, for her complaints of neck and back pain. (R. at 329.) On physical examination, Damron had full strength in both the upper and lower extremities; she had full cervical range of motion; her gait was normal; she could

---

were degenerative changes at the C5 level, there was no evidence of spinal cord impingement. (R. 275.)

[8] A lytic lesion refers to the destruction of an area of bone due to a disease process such as cancer. *See* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/lytic-lesion (last visited Nov. 8, 2023.)

walk on her heels and toes; she could do knee bends well on either leg; straight leg raising tests were negative; she displayed paralysis in dorsiflexion and marked weakness in plantar flexion on the left; and she had normal sensation. (R. at 327, 330.) Dr. Fraser found nothing that would require surgery. (R. at 327.) Dr. Fraser ordered a lumbar spine MRI, which showed minimal degenerative changes at the L5-S1 level, mild age-related facet change and no evidence of any disc extrusion or nerve root compromise. (R. at 330, 439-40.)

On June 14 and 19, 2008, Damron presented to the emergency department at Johnston Memorial Hospital, reporting back pain and right flank pain. (R. at 360-65, 994-1004.) A CT scan of Damron's abdomen and pelvis showed right ureteropelvic junction stricture with severe hydronephrosis and parenchymal scarring; small bilateral renal stones; and previous hysterectomy. (R. at 989.) She was diagnosed with acute back pain, (R. at 365), and hydronephrosis, hematuria and kidney stones. (R. at 1000.) On July 8, 2008, Damron underwent a right retrograde ureter pyelogram and stent placement for treatment of a kidney stone. (R. at 345-48.) Dr. Naum Spiegel, M.D., a urologist with the Urology Center, placed no restrictions on Damron's diet or activities. (R. at 387.)

On July 16, 2008, following her ureteroscopy, Damron reported that she was doing very well. (R. at 386.) Damron denied nausea, vomiting and fever. (R. at 386.) Dr. Spiegel performed a cystoscopy to remove Damron's stents. (R. at 386.) Despite a nuclear scan study showing that Damron's right kidney had lower function with decreased drainage, likely due to hydronephrosis, Dr. Spiegel reported that Damron appeared to be well and healthy overall. (R. at 386.) He noted that Damron's flank pain likely was due to obstructing stones. (R. at 386.)

On September 11, 2008, Damron's attorney referred her to Dr. William E. Kennedy, M.D., an orthopedic surgeon, in furtherance of her worker's compensation claim. (R. at 312-16.) Dr. Kennedy noted that, since Damron had not reached maximum medical improvement, he limited his physical examination to two-point discrimination testing, which was normal throughout all 10 digits. (R. at 314.) Dr. Kennedy diagnosed sprain to the cervical spine; multiple level degenerative disc disease of the cervical spine; displaced lumbar intervertebral disc, small central disc herniation, at the L5 level without radiculopathy; and multiple level degenerative disc disease of the lumbar spine (R. at 315.) Dr. Kennedy opined that Damron should not be required to perform rapid, repeated motions with her upper extremities; hammering or jerking with her upper extremities; turning her head to the extremes of any direction repeatedly; holding her head for prolonged periods in positions other than the comfortable, neutral position, as in looking forward; be subjected to jostling or bouncing; working with her hands elevated above shoulder level; repeated bending, stooping or squatting; working around rough terrain or in rough vehicles; working around vibrations; climbing ladders or working at heights; and crawling. (R. at 316.) He found that Damron should be able to control her posture as to sitting, standing or walking. (R. at 316.) He further found that Damron could lift/carry and push/pull items weighing up to 20 pounds occasionally and 10 pounds frequently. (R. at 316.) Dr. Kennedy found these restrictions to be permanent. (R. at 316.)

On December 2, 2008, Damron was admitted to Johnston Memorial Hospital for cystitis. (R. at 278-88). This quickly resolved, and at a follow up with urology a few weeks later, Damron was "doing very well" with no urinary symptoms, no abdominal pain, and no back pain. (R. at 384.) She "appear[ed] to be well." (R. at 384.) Damron received a cervical spine injection from Dr. Ihab Labatia, M.D., a physician with East Tennessee Brain and Spine Center, in December 2008, and it

was again noted that, Damron experienced some tenderness in her cervical spine and lumbar spine. (R. at 634.)

In 2008 and 2009 Damron saw Dr. Labatia, reporting neck and back pain. (R. at 615-40.) Damron was treated with medication, physical therapy[9] and intermittent steroid injections, which provided her with significant pain relief. (R. at 615, 619, 623, 625, 636, 639.) Damron reported that her neck pain increased when she performed yard work. (R. at 619, 623.) During this time, Damron had a normal gait; intact sensation;[10] full motor strength; normal reflexes; she had decreased range of motion of the cervical spine with tenderness to palpation, but normal movements; and her lumbar spine had normal range of motion with tenderness to palpation. (R. at 617, 624, 634, 637-38, 640.)

On April 27, 2009, Dr. Labatia opined that Damron could return to work that did not involve any prolonged driving; lifting of items weighing more than 30 pounds; or frequent bending, stooping or twisting. (R. at 623.) On July 21, 2009, Damron reported that she was able to perform three hours of yard work when she used her pain medication. (R. at 617.) On September 28, 2009, Damron reported her neck pain continued to improve since receiving her injection. (R. at 615.) Dr. Labatia opined that Damron could continue light-duty work that allowed her to alternate sitting, standing and walking every 45 minutes. (R. at 616.)

---

[9] In October and November 2008, Damron saw Dr. Labatia, reporting that physical therapy was improving her low back pain, and she continued to exhibit full (5/5) strength in her lower extremities, normal neurological tests, and normal range of motion in her lumbar spine. (R. at 637-38.)

[10] In November and December 2008, as well as April and July 2009, Damron exhibited decreased sensation in the left C5-7 and L4-L5 dermatomes. (R. at 617, 624, 634, 637.)

-11-

On December 2, 2009, Damron returned to Dr. Kennedy for an additional independent medical examination. (R. at 317-23.) Damron continued to complain of back and neck pain. (R. at 317.) Damron had a normal posture and gait; she moved her upper extremities in a normal fashion that did not suggest any loss of coordination or central nervous system disorder; she had bilateral paraspinous muscle spasm in her neck; she had decreased range of motion of the cervical spine; she had normal range of motion of both shoulders; she had equal and normal deep tendon reflexes in her upper and lower extremities; she had bilateral paraspinous muscle spasm in the lumbar region; she had decreased range of motion of the lumbar spine; she had normal strength in both lower extremities; her straight leg raising tests were negative; and she had normal sensation in both lower extremities. (R. at 319-20.) Dr. Kennedy's diagnoses and restrictions remained unchanged. (R. at 315-16, 320.) Based on Damron's injuries, Dr. Kennedy rated a nine percent whole person impairment from the lumbar spine and a three percent whole person impairment from the cervical spine, resulting in a 12 percent permanent physical impairment. (R. at 323.)

Throughout 2010, Dr. Labatia reported that Damron had a normal gait; she had full motor strength; her lumbar spine had decreased range of motion and tenderness to palpation with no swelling, edema, erythema or paraspinous muscle spasm; and she had normal sensation. (R. at 608, 610, 614.) Medications were improving her quality of life. (R. at 613.) On March 5, 2010, an MRI of Damron's lumbar spine showed spondylosis at the L4-L5 and L5-S1 levels without significant spinal canal stenosis or neural impingement and questionable right hydroureter[11] of

---

[11] Hydroureter is the enlargement of the ureter caused by any blockage that prevents urine from draining into the bladder. *See* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/hydroureter (last visited Nov. 8, 2023).

undetermined etiology. (R. at 435-36.) By August 2010, Damron reported that she was "fairly satisfied with her current status." (R. at 604.) She only took pain medications while gardening since that made her back hurt. (R. at 604.) She was not having any pain in her neck and seemed stable symptomatically. (R. at 604.) Her cervical and lumbar spine was normal upon examination: she had normal range of motion, no tenderness, no pain, normal movement, no fractures or deformities, normal posture and normal sensation. (R. at 605-06.) Damron stated that she was "doing well right now." (R. at 606.) Although Damron continued to complain of back pain to Dr. Labatia in October 2010, her gait was normal; straight leg raising tests were negative; she had intact sensation; motor strength was full in both the upper and lower extremities; she had normal reflexes; the cervical spine had normal range of motion with no tenderness and normal movements; and the lumbar spine had normal range of motion and normal sensation. (R. at 600.) This was the last visit during the relevant period with Dr. Labatia.

On May 10, 2010, Dr. James Mann, M.D., a physician with Abingdon Physician Partners, saw Damron for complaints of rectal bleeding, changes in bowel movements and vomiting. (R. at 340.) Examination revealed epigastrium tenderness and tenderness in the left lower quadrant. (R. at 340.) Dr. Mann diagnosed possible bile gastritis and radiation proctitis. (R. at 340.) In June 2010, biopsies from Damron's stomach were unremarkable, except for some congestion, and rectal biopsies showed minimal acute proctitis, suggestive of nonspecific reaction to a low-grade mucosal injury. (R. at 341.)

From August through December 2011, Damron was treated for urinary tract infection, dysphagia, bilateral hydronephrosis and an uropathy obstruction. (R. at 576-82.) During this time, Damon had full range of motion of her neck with no

tenderness; her abdomen was soft, nontender with no rigidity and normal bowel sounds; her upper and lower extremities showed no cyanosis or edema; she had full motor strength in all muscles; deep tendon reflexes were normal; and a musculoskeletal examination showed full range of motion and no tenderness. (R. at 577-78, 581.) On September 23, 2011, a CT scan of Damron's abdomen and pelvis showed bilateral severe obstructive changes involving both urinary systems; the cortical thinning of the kidneys suggested a chronic obstructive uropathy, bilaterally; possible ureteral wall thickening involving the right ureter at the pelvic brim; small volume pelvic free fluid; and absent uterus and ovaries. (R. at 431-33.) On October 4, 2011, Damron underwent a ureteroscopy with laser lithotripsy of a kidney stone and stent placement. (R. at 381.)

On January 23, 2012, Damron denied abdominal pain, constipation, diarrhea, vomiting and joint and muscle pain. (R. at 574.) In February and March 2012, Damron reported less than four stools per day and a mild increase in ostomy output. (R. at 336, 338.) She also reported occasional vomiting and nausea. (R. at 336, 338.) On May 8, 2012, Damron denied abdominal pain, constipation, vomiting and joint and muscle pain. (R. at 570.) She complained of nausea and diarrhea. (R. at 570.) Damron had full range of motion of the neck with no tenderness; the abdomen had no abnormal pulsations, it was nontender and showed no rigidity; upper and lower extremities showed no clubbing, cyanosis or edema and intact pulses; she had full motor strength in all muscles; deep tendon reflexes were normal; and a musculoskeletal examination showed full range of motion and no tenderness. (R. at 570-71.)

Throughout 2013, Damron was treated for urinary tract infections; gastroesophageal reflux disease, ("GERD"); nausea, secondary to GERD; and

overactive bladder. (R. at 561-62, 565-68, 721-28.) Damron was diagnosed with restless leg syndrome; acute urinary tract infection; urinary tract infection, chronic; nausea; anxiety; uropathy obstruction; GERD; and left leg pain. (R. at 567-68.) On October 29, 2013, Damron reported that her urinary incontinence was controlled with medication. (R. at 557.) She denied joint and muscle pain and stated that she felt well. (R. at 557-58.) On November 26, 2013, a CT scan of Damron's abdomen and pelvis showed interval enlargement of a sliding hiatal hernia, in comparison to a September 2011 CT scan; persistent chronic hydronephrosis and hydroureter; and chronic surgical changes in the pelvis. (R. at 428-29.) Damron's examinations showed she had full range of motion of the neck with no tenderness; the abdomen had no abnormal pulsations, it was nontender and showed no rigidity; upper and lower extremities showed no clubbing, cyanosis or edema and intact pulses; she had full motor strength in all muscles; deep tendon reflexes were normal; and a musculoskeletal examination showed full range of motion and no tenderness. (R. at 558-59, 562-63, 566-67.)

On January 9, 2014, Damron was treated at Wellmont Medical Associates for complaints of frequent urinary tract infections and left-sided lower back pain. (R. at 544.) Damron continued treatment at Wellmont Medical Associates throughout 2014 for chronic urinary tract infections. (R. at 488-511, 521-22, 544.) Damron had normal range of motion of the neck; the abdomen had normal bowel sounds with no masses and generalized tenderness; and musculoskeletal examinations showed normal range of motion with no edema or tenderness. (R. at 499, 521-23.)

From February to April 2014, Damron treated at Urology Associates of Kingsport for severe, bilateral hydronephrosis and radiation cystitis. (R. at 731-35, 760-61.) On March 19, 2014, a CT scan of Damron's abdomen and pelvis showed

chronic obstructive uropathy with abrupt cutoff of the distal ureters projecting over the postsurgical changes within the pelvis. (R. at 741-42.) On March 20, 2014, Dr. Arthur T. Wyker, M.D., noted that Damron's renal function was good. (R. at 760.) In April 2014, Damron reported nocturia two to three times per night; she denied urgency incontinence but reported occasional stress incontinence; and she reported that her symptoms improved with medication. (R. at 731.) Dr. James R. Herman, M.D., Ph.D., reported that Damron's bladder and distal ureters probably were not salvageable, but she had well-preserved distal bowel function. (R. at 734.) He did not believe she would be a candidate for continent diversion due to radiation injuries to her proximal colon and terminal ileum. (R. at 734.)

From March 2014 through June 2014, Damron was treated at University Surgeons Associates for a hiatal hernia; chronic reflux esophagitis; esophageal reflux; dysphagia; and constipation. (R. at 465-84.) She denied joint pain; low back pain; nausea; vomiting; and abdominal pain. (R. at 466, 472, 476.) Examinations revealed that Damron's abdomen was not distended with normal bowel sounds and no tenderness or rigidity; posture and balance were normal; and she had normal muscle strength and tone. (R. at 468, 473, 477.) In April 2014, Damron underwent laparoscopic hernia repair and posterior Toupet fundoplication.[12] (R. at 471, 478-82.)

In February 2015, Damron saw Dr. Gopal H. Badlani, M.D., a urologist, for evaluation of bilateral hydronephrosis. (R. at 777-81.) Damron reported that, although she urinated frequently, her medication helped. (R. at 777.) A urodynamic study showed decreased cystometric capacity, but Damron's bladder had no loss of

---

[12] Fundoplication is one of the most common surgeries used to treat heartburn caused by GERD. *See* https://www.healthline.com/health/gerd/fundoplication (last visited Nov. 8, 2023.)

compliance or overactivity. (R. at 781.) Dr. Badlani diagnosed hydronephrosis, ureteral stricture and recurrent urinary tract infection. (R. at 781.)

On April 28, 2015, Dr. Richard Surrusco, M.D., a state agency physician, found that Damron had the residual functional capacity to lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; she could stand and/or walk up to four hours in an eight-hour workday; she could sit up to six hours in an eight-hour workday; and she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl and never climb ladders, ropes and scaffolds. (R. at 118-19.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 119.) Thus, Dr. Surrusco opined that Damron's condition was not disabling on any date through December 31, 2013, her date last insured. (R. at 121.) Dr. Surrusco noted that Dr. Kennedy's opinion relied heavily on the subjective report of symptoms and limitations provided by Damron, and the totality of the evidence did not support his opinion. (R. at 120.)

On July 29, 2016, Dr. Henry Scovern, M.D., a state agency physician, opined that Damron had the residual functional capacity to perform medium[13] work. (R. at 139-40.) Dr. Scovern found no postural, manipulative, visual, communicative or environmental limitations. (R. at 140.)

*III.  Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20

---

[13] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2022).

C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless*

*Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Damron argues that the ALJ erred by failing to follow the directives of this court's June 2020 Report and Recommendation. (Plaintiff's Brief at 4-7.) Particularly, Damron argues the ALJ erroneously failed to incorporate into the residual functional capacity finding a specific restriction on her ability to stand and walk. (Plaintiff's Brief at 5-7.) She also argues the ALJ erred by not finding her disabled pursuant to Rule 201.10 or 201.14[14] of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, ("Grids"). (Plaintiff's Brief at 4, 7-9.) Damron argues that the ALJ erred by relying on vocational expert testimony that did not include all the facts. (Plaintiff's Brief at 4, 9-10.)  Particularly, Damron argues that the ALJ failed to ask a hypothetical that included limitations caused by her chronic kidney disease. (Plaintiff's Brief at 4, 9-10.) Damron argues the ALJ erred by finding she could perform her past relevant work. (Plaintiff's Brief at 4, 10.) Damron further argues the ALJ erred by giving "some weight" to the state agency consultants and by giving only "little weight" to Dr. Kennedy's opinions. (Plaintiff's Brief at 4, 11-12.)  Finally, Damron argues that the ALJ erred by substituting his lay opinion for those of treating and examining physicians, specifically the opinions of Dr. Kennedy, Dr. Labatia and Dr. Surrusco. (Plaintiff's Brief at 4, 12-13.)

Although Damron presents seven different arguments, her primary argument centers around the ALJ's failure to wholly accept the opinions of Drs. Kennedy, Labatia and Surrusco, specifically with respect to her ability to sit, stand and walk. The ALJ is not required to adopt a residual functional capacity assessment of a

---

[14] Damron argues that, under Rule 201.14, she would be disabled as of the date she changed age categories. (Plaintiff's Brief at 7-9.) It is noted that Rules 201.10 and 201.14 are used when a claimant is limited to sedentary work.

treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2022); *see also* 20 C.F.R. § 404.1527(d)(2) (2022) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of her own limitations. *See* 20 C.F.R. § 404.1545 (2022).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a). The ALJ found that, through the date last insured, Damron had the residual functional capacity to perform light work that required no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling or exposure to vibration and work at unprotected heights. (R. at 1144.)

In making this residual functional capacity finding, the ALJ stated he was giving little weight to Dr. Kennedy's opinion that Damron must be able to control her posture, as it was not consistent with the objective medical evidence of record that showed only mild degeneration of her lumbar spine, full strength in her lower extremities and a normal gait. (R. at 1149.) The ALJ noted that imaging of Damron's lumbar spine showed only mild degeneration. (R. at 1149.) In fact, Dr. Kennedy noted that Damron walked with a normal posture and a normal gait and did not require any assistive devices, and she moved her bilateral upper extremities in a normal fashion that did not suggest any loss of coordination or central nervous system disorder. The ALJ noted that Damron had full range of strength in her lower extremities and a normal gait, suggesting an "undiminished ability to stand and walk

consistent with the requirements of light work." (R. at 1149.) The record shows that Damron had full range of motion of the neck with no tenderness; her abdomen had no abnormal pulsations, it was nontender and showed no rigidity; her upper and lower extremities showed no clubbing, cyanosis or edema and intact pulses; she had full motor strength in all muscles; deep tendon reflexes were normal; and a musculoskeletal examination showed full range of motion and no tenderness. The ALJ noted that Damron could do gardening and yard work, which required a lot of kneeling, stooping and bending, for three hours at a time, which amounts to more than an occasional basis in an eight-hour workday. (R. at 1148-49.) Furthermore, Damron reported Tylenol controlled her pain. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Similarly, the ALJ gave Dr. Labatia's limitation regarding alternating sitting, standing and walking every 45 minutes little weight, as Damron consistently exhibited full strength in her lower extremities and a normal gait, suggesting her ability to stand and walk was consistent with light work. (R. at 1149.) The ALJ recognized that Dr. Labatia's own treating notes indicated that Damron had full range of motion in her lumbosacral spine, full muscle strength in her lower extremities and negative straight leg raising tests. (R. at 1149.)

Finally, the ALJ gave little weight to Dr. Surrusco's finding that Damron was limited to standing and walking for four hours in an eight-hour workday. (R. at 1150.) The ALJ again noted that Damron had full strength in her lower extremities and walked with a normal gait, suggesting "her ability to stand and walk is consistent with that required for light work." (R. at 1150.) The ALJ gave Dr. Scovern's opinion some weight, as he found Damron could perform light work rather than medium

work with occasional postural movements due to her residual back and neck pain, which Damron reported worsened with yard work and gardening. (R. at 1150.) Dr. Scovern found that Damron could stand and walk for six hours in an eight-hour workday, highlighting that there were no active allegations of back pain in the treatment notes around the 2013 date last insured. As noted above, Damron's physical examinations consistently showed normal gait and strength, and she reported significant benefit from her pain treatment prior to the date last insured. *See Gross,* 785 F.2d at 1166.

Damron also argues that the hypothetical question posed to the vocational expert was faulty because it did not incorporate limitations caused by her chronic kidney disease. (Plaintiff's Brief at 4, 9-10.) For a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all the claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The ALJ, however, has "great latitude in posing hypothetical questions" and is free to accept or reject suggested restrictions so long as there is substantial evidence to support the ultimate questions. *See Koonce v. Apfel*, 166 F.3d 1209, at *5 (4th Cir. 1999).

The ALJ considered Damron's gastrointestinal and renal impairments throughout the relevant period, explaining that, although Damron had repeat urinary tract infections, she also consistently reported to her urologist that she was "doing very well." (R. at 384, 386, 1147-48.) In 2008, despite Damron's right kidney having lower function with decreased drainage likely due to hydronephrosis, Dr. Spiegel reported that Damron appeared to be well and healthy overall. In December 2008, Damron reported "doing very well" with no urinary symptoms, no abdominal pain and no back pain, and again, Dr. Spiegel noted that Damron "appear[ed] to be well."

Throughout 2013, Damron was treated for urinary tract infections; GERD; nausea, secondary to GERD; and overactive bladder and, in October 2013, she reported her urinary incontinence was controlled with medication. In March 2014, Dr. Wyker noted that Damron had good renal function. In April 2014, although Damron reported nocturia two to three times per night, she denied urgency incontinence, but reported occasional stress incontinence; and she reported that her symptoms improved with medication. In 2015, a urodynamic study showed decreased bladder capacity, but Damron's bladder had no loss of compliance or overactivity. Damron reported that, although she urinated frequently, her medications helped. *See Gross,* 785 F.2d at 1166. The ALJ explained that he limited Damron to "light exertional work because she has some ongoing pain and symptoms from her bladder and kidney problems." (R. at 1150.)

Damron contends the ALJ failed to accept the vocational expert's testimony that, if she were to be off task more than 10 percent during the workday or be absent from work more than once a month on a regular basis, all work would be precluded. (Plaintiff's Brief at 10.) The ALJ is not required to adopt the vocational expert's response to hypothetical questions regarding additional limitations that the ALJ ultimately declined to adopt. *See Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 690 (3d Cir. 2020) ("The ALJ's subsequent hypothetical question about a person who would be off-task fifteen percent of the time, does not bind him to the premise of the question, nor to the expert's answer that such a hypothetical person would not be capable of performing past work."). Because the ALJ reasonably declined to assess the limitations in the alternative hypothetical question based on the record evidence, there was no error. *See Hammond v. Apfel*, 5 F. App'x 101, 105 (4th Cir. 2001) ("Based on an evaluation of the evidence, the ALJ was free to accept or reject restrictive hypothetical questions."); *Davis v. Apfel*, 162 F.3d 1154, at *2 (4th Cir.

Sept. 2, 1998) (An ALJ is not required to accept the answers a vocational expert gives to a hypothetical that contains limitations not ultimately adopted by the ALJ).

For the above-stated reasons, I find that substantial evidence exists to support the ALJ's finding that, prior to her date last insured, Damron had the residual functional capacity to perform a limited range of light work. Based on this finding, I do not address Damron's remaining arguments.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding regarding Damron's residual functional capacity through the date last insured; and

2. Substantial evidence exists in the record to support the Commissioner's finding that, through the date last insured, Damron was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Damron's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. §
636(b)(1)(C):

> Within fourteen days after being served with a copy [of this
> Report and Recommendation], any party may serve and file written
> objections to such proposed findings and recommendations as provided
> by rules of court. A judge of the court shall make a de novo
> determination of those portions of the report or specified proposed
> findings or recommendations to which objection is made. A judge of
> the court may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge. The judge may also
> receive further evidence or recommit the matter to the magistrate judge
> with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to the
Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:     November 8, 2023.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE